# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 4, 2012

## STATE OF TENNESSEE v. TERRENCE HILL

**Appeal from the Criminal Court for Shelby County**
**No. 09-02062      Chris Craft, Judge**

_____

**No. W2012-00733-CCA-R3-CD  - Filed February 11, 2013**

_____

A Shelby County jury convicted the Defendant, Terrence Hill, of second degree murder.  The trial court imposed an eighteen-year and six-month sentence in the Tennessee Department of Correction, to be served at 100%.  On appeal, the Defendant argues that: (1) the evidence is insufficient to support his conviction; and (2) the trial court erred when it discharged a prospective juror based upon her inability to be impartial.  After thoroughly reviewing the record and applicable authorities, we find that the evidence is sufficient to sustain the Defendant's conviction and that the trial court did not err in discharging the prospective juror.  Accordingly, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Leslie I. Ballin and Richard S. Townley, Memphis, Tennessee, for the appellant, Terrence Hill.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephen Crossnoe and Marques Young, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

This case arises from the Defendant's participation in the murder of the victim, Tonya Hill, who was the Defendant's wife. A Shelby County grand jury indicted the Defendant for one count of first degree murder.

**A. Jury Selection**

Before the Defendant's trial on the charge of first degree murder, the trial court oversaw the voir dire of the prospective jurors. The trial court then accepted fourteen prospective jurors, including the juror in question ("the Juror"). Immediately after the trial court dismissed the remaining jury pool, but before it swore in and empaneled the fourteen prospective jurors, the Juror informed a deputy that she needed to discuss a matter with the trial court. The Juror informed the trial court that, the weekend before the voir dire proceedings, an incident had occurred between her and her husband and the Memphis Police Department. She stated that it "did not play out too good" and that she did not think she "could really judge anybody right now."

The Juror explained to the trial court that an altercation occurred when she and her husband drove out of the parking lot of a Kentucky Fried Chicken restaurant. She stated that a "seventy year old man" pulled out of the restaurant parking lot in front of them and "kept stomping on his brakes all the way around the street." After both vehicles turned onto another road, the Juror and her husband drove around the other man's car, drove to the Juror's mother's house, and parked in the driveway. The Juror explained that the man also drove to her mother's house and parked on the street in front of the house. The Juror's husband asked the man to leave, but, instead, the man drove down the street, turned around, and parked behind their car. The Juror stated that the man then emerged from his car with a gun, after which she called the police.

The Juror stated that, when police officers arrived, they did not believe what she and her husband told them about the man. The Juror alluded that the skepticism from the police officers may have been due to the man's job, explaining that the man's employment involved him "giv[ing] out warrants . . . or something." She stated that police officers remained at her mother's house for two hours. The Juror said that she told the officers that she and her husband planned to seek charges against the man, so they went to the police station. The Juror then explained the following:

> But, as soon as we pulled up, one of the detectives got my husband and
> told him that he was driving the car and all of that, but he wasn't driving. He
> had a driving charge that he had gone to Court on and they wouldn't believe
> that he wasn't driving the car. The man said that he was driving the car, but

everybody was on the porch and my neighbor[s] they seen that I had jumped out of the driver's seat, you know, when this was going on.

But when we got there, they wouldn't believe nothing, when we got down here, they wouldn't believe - they didn't ask me no questions about what happened, but they harassed him and let him sign some type of paper saying that he couldn't press charges on this man. If he signed the papers to press charges, he was going to go to jail, for his driving record, or something that had nothing to do with the situation that went on at the house that day.

The Juror stated that her husband had a pending charge, driving without a license, in Shelby County at the time the incident occurred.

The trial court asked the Juror whether the incident would influence her judgment as a juror, and she replied, "It might a little bit." When asked by the State whether she would be able to accept a police officer's testimony and assess the officer's credibility in an impartial manner, the Juror replied, "No, because how everything played out, it didn't play out right between, both parts." She explained that the incident caused her to call into question the credibility of "some" police officers and, because the incident happened recently, it was "fresh" on her mind. Upon questioning by defense counsel, the Juror agreed that she did not distrust all police officers and agreed that it "shouldn't be a problem" as long as the police officers in the current case were not the same as the officers she encountered. Conversely, when asked again by the State whether she could weigh the testimony of officers the same as that of other witnesses, the Juror answered, "I really don't know for sure. I can't say, for sure, that I could." Upon further questioning by defense counsel, the Juror stated, "I would listen to everything, you know, that they're saying, you know, but I am not for sure that I can say what they are saying is true, because of what I went through."

After listening to the Juror's response, the trial court found that she could not "promise" that she would be able to be fair in this case. As the trial court explained its finding, it once again asked the Juror whether she could be fair, and she responded, "Not at this time, I can't. . . . because it just happened this weekend." The trial court then stated, "It's clear to me that she is concerned, so for that reason we will just go with the thirteen [prospective jurors] that we have." The trial court excused the Juror from serving on the jury.

Defense counsel objected to the Juror's being excused because "she said she would try, that is all any juror can tell us," and defense counsel requested that the entire jury be released because defense counsel had seven peremptory challenges they did not use during the voir dire process. Defense counsel argued that, therefore, the Defendant was "now left

3

with a jury that [he] would not have otherwise been stuck with." The trial court denied defense counsel's request, explaining that "it's clear from [the Juror's] answers that this happened recently and because of that, saying that she could try, that is not good enough. She was going to have to actually take that oath and she can't do that." The trial court further stated that "we have thirteen jurors that were picked and I understand that [defense counsel] did not exercise all of its peremptory challenges, but . . . we will just go with the thirteen that we have."

## B. Jury Trial

After the thirteen jurors were sworn, the trial proceeded, and the parties presented the following evidence: Terry Thompson, an officer with the Memphis Police Department, testified that, on May 1, 2008, he and his partner responded to a "wounding call" at the Defendant's residence in Memphis. Officer Thompson stated that, when he arrived, the Defendant answered the door. The officer observed a wound in the Defendant's shoulder and, "at that point[,] assumed that [the Defendant] was the victim." The officer then asked the Defendant if another person was in the house, and the Defendant replied, "She's upstairs." Then, as the Defendant walked passed Officer Thompson's partner, the Defendant said, "I did it." The officer testified that the Defendant was "really calm" and that he "[w]asn't excited and just [had] a blank expression."

Officer Thompson went upstairs, where he encountered a woman standing next to a bed in one the rooms, looking at a female victim lying on the bed. The officer described the victim as "female, white, in either a shirt, or a nightgown, wearing only her underwear, lying on the bed . . . [with] a little bit of blood on her." He said that the woman had no pulse and was not breathing. About that time, the fire department arrived on the scene and confirmed that the woman was deceased. Officer Thompson then escorted everyone out of the house, called for a supervisor, and secured the scene to preserve evidence.

During cross-examination, Officer Thompson agreed that it was possible that the Defendant exhibited a calm demeanor because he was "possibly [] in shock." Regarding the Defendant saying, "I did it," the officer assumed that the Defendant had stabbed someone in the house. Officer Thompson clarified that the woman in the bedroom standing next to the bed was the Defendant's mother.

Kenneth Newton, a lieutenant with the Memphis Fire Department and a trained paramedic, testified that, on May 1, 2008, he responded to a "stabbing" call at the Defendant's residence and arrived at approximately 10:00 a.m. Lieutenant Newton stated that, upon arrival, he went upstairs with other firefighters. There, he found the victim lying on her back on the bed. The victim was surrounded by blood, her shirt was covered with

4

blood, she was pale and cold, and her eyes were dilated. She was not moving or breathing. The lieutenant stated that emergency responders used an EKG monitor to look for signs of life, and they found none.

Lieutenant Newton said that, after the firefighters determined that the victim was deceased, they exited the house and checked the Defendant, who was sitting in a police squad car. Lieutenant Newton stated that the Defendant had wounds to the left side of his chest, one of which was "bubbling blood," indicating to the lieutenant that the Defendant's lung was punctured. During his examination of the Defendant, who appeared "calm," the lieutenant determined that the Defendant's vital signs were normal, other than his respirations, which were faster than normal. The lieutenant said that both the Defendant's skin and his pupils appeared normal. The lieutenant testified that the Defendant was not able to appropriately answer questions about "time, place and things . . . ."

On cross-examination, Lieutenant Newton stated that the Defendant had eight wounds, all of which the Defendant indicated were self-inflicted.

Caroline Mason, a lieutenant with the Memphis Police Department, testified that, at the time of the incident, she was a sergeant in the homicide bureau of the police department. The lieutenant explained that she was the lead person investigating the case. Through her work on this case, the lieutenant identified the victim as Latonya Hill, the Defendant's wife. She also assisted in interviewing the Defendant on May 6, 2008, five days after the victim's stabbing. Lieutenant Mason said she advised the Defendant of his *Miranda* rights, after which the Defendant agreed to speak with police officers. Lieutenant Mason described the Defendant's demeanor as "calm," saying that "he spoke very clearly, followed very well, when he was speaking." She testified that the Defendant indicated that he understood that he was being interviewed. The lieutenant, however, had to stop the interview with the Defendant because "he didn't remember some things and it seemed like he wasn't clear on some things . . . ." After she and two other officers transported the Defendant to the jail, the Defendant indicated that he wanted to return to the interview room and finish the interview. At that time, Sergeant James T. Max led the interview.

On cross-examination, Lieutenant Mason clarified that the Defendant did not ask for an attorney before she interviewed him.

James T. Max, a sergeant with the Memphis Police Department, testified that he was assigned to the homicide bureau of the police department. He stated that he conducted the second interview with the Defendant, and he identified a written transcription of the interview. According to the written statement, the following occurred during the interview:

5

QUESTION:    Are you responsible for the death of Tonya E. Hill . . . on Thursday, May 1, 2008 at approximately 6:30 a.m.? The answer is, "Yes."

QUESTION:    Do you know Tonya E. Hill and if so how?

ANSWER:      Yeah, I am married to her.

QUESTION:    How long have you known Tonya E. Hill?

ANSWER:      Five years.

QUESTION:    How long have you and Tonya E. Hill been married?

ANSWER:      Two years.

QUESTION:    Did you use a weapon and if so, describe it?

ANSWER:      I used my hand, but at the same time they say I used a knife, so I had to.

QUESTION:    Who are you referring to as, "they say I used a knife"?

ANSWER:      Basically the people with the allegations said that she had been stabbed. I can recall choking her and stabbing is something that I don't recall as vividly as I do the choking.

QUESTION:    Did you, at any time, place your hand, or hands, around Tonya E. Hill's neck and attempt to choke her during this incident?

             The answer is; Yes.

QUESTION:    Were you angry with Tonya E. Hill, prior to placing your hand or hands around Tonya's neck in an attempt to choke her?

ANSWER:      Yes.

6

QUESTION:     At what point during this incident did you grab a knife and began stabbing Tonya E. Hill?

ANSWER:     I can't recollect that.

QUESTION:     Please explain, in detail, the events prior to, during and after this incident?

ANSWER:     Pretty much I found a number and came to her with it and she started laughing. I pretty much said that caused disease and she said that I couldn't have your disease unless it was AIDS. And pretty much I got angry at her and she started laughing. She was touching on my face and kissing my jaws and I told her that if she loved me she wouldn't have said nothing like that. After that, I went and got something to drink and I came back up. She was still doing the same thing, touching my face and kissing me. Basically, she said the same thing over again and pretty much I grabbed her by the neck. But, I didn't grab her in the hard way, at first.

After that, she said, "Well, you still got AIDS." Pretty much I started choking her a little bit harder, then she said it again and[,] after that[,] all I know about is that I was choking her.

After that I pretty much realized that she wasn't breathing after awhile, when it was time for the kids to wake up, so I started to stab myself, in attempt to kill myself.

The alarm clock went off. I covered myself with a sheet and woke up the kids to get them ready for school. They got ready and my mom came and picked them up and took them to school. After dropping them off, she came right back to the house.

When she got back to the house, she got to looking at me. She asked me what was wrong and I told her,

7

"you're going to be really upset with me". And that is when we moved upstairs and when she viewed Tonya.

She called my daddy and both of them called the police. The police and ambulance showed up and took me to the hospital.

During the interview, the Defendant also told Sergeant Max that the victim was unarmed during the incident. The Defendant told the sergeant that he began stabbing himself "fifteen to twenty minutes" after he noticed the victim was not breathing. Sergeant Max stated that, when he asked the Defendant how many knives he used during this incident in which both the Defendant and the victim were stabbed, the Defendant told him that he used one or two knives. The Defendant also stated that he used knives that were already located in the house and that the incident took place on a bed in the computer room, which was on the second floor of his house. The Defendant, however, could not recall how many times he stabbed the victim or how many times he stabbed himself. He only remembered "the choking part." The Defendant told Sergeant Max that no one else participated in the incident that resulted in the victim's death.

In response to Sergeant Max's questions about his relationship with the victim, the Defendant said that he and the victim had both engaged in extramarital affairs. When asked specifically whether the victim had engaged in an extramarital affair, the Defendant responded that both he and the victim had been accused of having extramarital affairs but that no one "really kn[ew] the truth."

During the interview, the Defendant then described to the sergeant the events leading to the attack, saying that, before the attack, the Defendant saw a number appear on the victim's phone, which he recognized as belonging to the father of the victim's child. Sergeant Max asked the Defendant how angry he had become after the victim told him that she had given him AIDS. The Defendant responded, "On a scale of one to ten, I was probably nine-point-five . . . ." The Defendant insisted that he had not intended to kill the victim.

During cross-examination, Sergeant Max stated that, when he asked the Defendant whether he had a plan to kill the victim, the Defendant responded, "[N]o."

Roger Wheeler, a crime scene investigator with the Memphis Police Department, testified that he assisted in investigating the crime scene in this case. As part of his investigation, Officer Wheeler gathered evidence, took photographs, and wrote a report about

his findings. The officer found two knives lying near the edge of a computer desk in the upstairs bedroom of the crime scene.

At trial, Officer Wheeler identified the knives that he found at the crime scene. He described one knife as an eleven-inch-long steak knife with a black handle. He examined that knife and stated that there appeared to be blood on it. The officer then identified the other knife in court. He stated that it was a black-handled steak knife, was about seven or eight inches in length, and appeared to have blood on it. He stated that he found the knives in the bedroom, lying near the edge of a computer desk located in the room. Officer Wheeler also identified photographs he took of the crime scene and other items that he examined and collected, including blankets, sheets, and bath towels.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County and an expert in forensic pathology, testified that she performed the autopsy of the victim's body. Dr. Chancellor determined that the manner of death was homicide and that the death resulted from multiple stab wounds and from manual strangulation.

Dr. Chancellor testified that she found a total of twenty-six separate stab wounds to the victim's body, which were mostly located on the victim's torso, chest, and abdomen area. She found wounds on both the front and back of the victim's body. In her report, Dr. Chancellor categorized the wounds in several groups. She labeled a group of nine separate stab wounds as group "A" because they were oriented in a similar fashion on the back of the left shoulder and likely occurred near the same time. The doctor stated that those wounds did not enter the body cavity and did not result in any significant injury to the victim. Dr. Chancellor labeled a group of three stab wounds on the victim's mid-back as group "B," describing these wounds as wounds that did not cause significant injury. Group "C" indicated a group of three stab wounds on the back of the victim's neck, which did not result in any significant injury to an organ.

Dr. Chancellor, however, categorized three specific wounds as "significant, in that they could have resulted in death." She labeled these three serious stab wounds as "GG," "D," and "G." Wound "GG" entered on the left side of the victim's back and penetrated the chest wall, entering the chest cavity between two ribs. The stab wound did not puncture the lung, but could have resulted in injury and some bleeding inside the body. Wound "D" penetrated the victim's body through two of her ribs, resulting in injury to the victim's heart. Dr. Chancellor stated that the depth of wound "D" was approximately one and a half to two inches. The stab wound cut the right atrium, "the chamber [of the heart] that receives blood from the body from whence it goes out of the heart and back to the rest of the body." Wound "G" was located on the outer part of the victim's right breast. The stab wound penetrated between two of the victim's ribs and entered the chest cavity, going "completely through the

right lung and penetrat[ing] into one of the ribs on the back of the chest." The doctor measured this wound as seven inches deep and found nearly a half of liter of blood surrounding the right lung. Dr. Chancellor explained that she normally would find twice as much blood in association with this type of stab wound, which led her to conclude that, at the time the victim sustained this wound, her heart "may not have been functioning in an efficient way."

In addition to the stab wounds, Dr. Chancellor found several marks on the victim's neck. She stated that the marks could have been a result of fingernails from a hand around the victim's neck, which created a suspicion that the death was a result of manual strangulation. The victim's eyes also contained petechial hemorrhages, which the doctor said were also consistent with manual strangulation. Further, Dr. Chancellor detected hemorrhages in the victim's neck muscles. The combination of those three injuries, the marks on the victim's neck, the petechial hemorrhages in the eye, and the neck muscle hemorrhages, caused Dr. Chancellor to conclude that the victim was manually strangled.

Dr. Chancellor did not find any evidence of a struggle between the victim and the Defendant. The doctor said she could not determine which of the injuries occurred first or the order in which the victim received the injuries.

During cross-examination, Dr. Chancellor clarified that, because wounds "D" and "G" resulted in less than normal blood loss, these wounds were likely inflicted upon the victim while she was in the process of dying.

Based upon this evidence, the jury convicted the Defendant of the lesser-included offense of second degree murder.

The trial court sentenced the Defendant to eighteen years and six months to be served in the Tennessee Department of Correction, at 100%. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant argues that: (1) the evidence is insufficient to support his conviction; and (2) the trial court erred when it discharged a prospective juror based upon her inability to be impartial.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. Specifically, he argues that the proof did not show that he acted knowingly as required by statute defining second degree murder. *See* T.C.A. § 39-13-210(a)(1) (2010). Alternatively, he argues that the proof showed that he "was in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner," and that, therefore, he should have been convicted of voluntary manslaughter. The State responds that there is sufficient evidence in the record to support the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) ((citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Second Degree Murder

The Defendant specifically contends that he did not "knowingly" kill the victim because "he was not aware of how hard he was choking [the victim] until he realized [the victim] wasn't breathing." Further, the Defendant claims that he "did not remember inflicting the stab wounds" on the victim and that, even if he did inflict the stab wounds, "there is no indication in the record of his mental state when he did so." Therefore, he argues that "no rational juror could find . . . that the stab wounds, as opposed to the strangulation, were the proximate cause of the victim's death." As such, the Defendant asserts that "the requirement of a knowing killing must be proven in regard to [the Defendant's] mental state during the strangulation, not the stabbing." He then reiterates that he did not know how hard he was choking her so he did not have the necessary mens rea.

The Defendant was convicted of second degree murder, which is defined as the "knowing killing of another." T.C.A. § 39-13-210(a)(1). In other words, a conviction for second degree murder requires proof beyond a reasonable doubt that the defendant unlawfully and knowingly killed the victim. *See* T.C.A. §§ 39-13-201, -210(a)(1) (2010). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." T.C.A. §§ 39-11-106(20), -302(b) (2010). "[A] result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "Whether a defendant acted 'knowingly' in killing another is a question of fact to be addressed by the jury." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn.

12

2010) (citing *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); *State v. Brunner*, No. W2008-01444-CCA-R3-CD, 2009 WL 2151822, at *6 (Tenn. Crim. App., at Jackson, July 17, 2009), *perm. app. denied* (Tenn. Nov. 23, 2009)). "[I]t is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' 'from surrounding facts and circumstances.'" *Id.* (quoting *State v. Lowery*, 667 S.W.2d 52, 57 (Tenn. 1984)).

After reviewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's conviction for second degree murder. The evidence established that, before the attack, the Defendant became angry at the victim after she told him that she had given him AIDS. The Defendant told investigators that on a scale of one to ten, his anger was "probably nine-point-five . . . ." The Defendant described where the incident occurred in the house, and he admitted that he used his hands to choke the victim. While the Defendant did not recall stabbing the victim, he did recall possessing one or two knives to stab himself after he realized the victim was dead.

The autopsy of the victim's body showed that her death was the result of multiple stab wounds and manual strangulation. Regarding the stab wounds, Dr. Chancellor testified that the victim suffered a total of twenty-six separate stab wounds to her body, which were mostly located on her torso, chest, and abdomen area. Three of those stab wounds were "significant, in that they could have resulted in death." Considering the severity of the injuries to the victim's heart and lungs, it appeared that these wounds were inflicted with significant force. Specifically, Wound "GG" entered on the left side of the victim's back and penetrated the chest wall, which could have resulted in injury and some bleeding inside the victim's body. Wound "D" penetrated the victim's body through two of her ribs, cutting the right atrium of the heart. Wound "G" penetrated between two of the victim's ribs and entered the chest cavity, going "completely through the right lung and penetrat[ing] into one of the ribs on the back of the chest." The victim's body also exhibited signs indicating she had been manually strangled, including marks on her neck, petechial hemorrhages in her eyes, and neck muscle hemorrhages. Her body, however, gave no indication that she engaged in a struggle with the Defendant during the attack.

We conclude that the jury was within its authority to infer that the "facts and circumstances" articulated above proved that the Defendant acted "knowingly" when he strangled and stabbed the victim. *See Brown*, 311 S.W.3d at 432. We find unpersuasive the Defendant's contention that the evidence is insufficient because he did not know how hard he was choking the victim until she stopped breathing. *See State v. Jonathan Fortener*, No. E2008-01775-CCA-R3-CD, 2010 WL 1241629, at *13 (Tenn. Crim. App., at Knoxville, Mar. 31, 2010), *perm. app. denied* (Tenn. Aug. 25, 2010). The Defendant admitted to choking the victim and, although he denied knowing that choking the victim would kill her,

13

he was nevertheless aware of his actions. Further, the jury discredited the Defendant's contention that he did not know that choking the victim would result in her death. As a result, the evidence was sufficient to allow the jury to find the Defendant guilty of second degree murder.

We similarly reject the Defendant's contention that the evidence is insufficient because there was no evidence that he stabbed the victim "knowingly" and the stabbing was not the proximate cause of her death. As previously mentioned, the victim suffered a total of twenty-six separate stab wounds to her body, with three of those stab wounds being serious enough to result in the death of the victim. *See State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998) ("Intent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case . . . . [including] the use of a deadly weapon, the number of wounds inflicted, the seriousness of the wounds . . . ."); *State v. Eric Ricardo Middleton*, No. W2010-01427-CCA-R3-CD, 2011 WL 5573730, at *22 (Tenn. Crim. App., at Jackson, Nov. 14, 2011), *perm. app. denied* (Tenn. April 12, 2012) ("Given the multiple stab and slash wounds to [the victim's] neck and chest, the jury certainly could have concluded that the defendant knowingly killed her."). Further, with second degree murder, "the result of the conduct is the sole element of the offense." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "The 'nature of the conduct' that causes death or the manner in which one is killed is inconsequential under the second degree murder statute." *Id.* "The statute focuses purely on the result and punishes an actor who knowingly causes another's death." *Id.* Therefore, in this case, it does not matter whether the proximate cause of the victim's death was stabbing or strangulation. Rather, it only matters that the Defendant acted with the appropriate mental state at the time of the attack. Accordingly, we conclude that the evidence was sufficient for the jury to conclude that the Defendant knowingly killed the victim by either stabbing or strangulation, or a combination of both. The Defendant is not entitled to relief on this issue.

### 2. Adequate Provocation

In the alternative, the Defendant contends that the evidence is insufficient to sustain his second degree murder conviction because he "was in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner," and the jury should have, therefore, convicted him of voluntary manslaughter. *See* T.C.A. § 39-13-211 (2010).

Before deliberating, the jury in this case received appropriate instructions on voluntary manslaughter as a lesser-included offense of second degree murder. Further, the trial court instructed the jury, per Tennessee Pattern Jury Instructions—Criminal § 7.06, as to the difference between second degree murder and voluntary manslaughter: "The distinction

14

between Voluntary Manslaughter and second degree murder is that Voluntary Manslaughter required that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The jury, as the trier of fact, determines the weight and value of the evidence and resolves all conflicts in the evidence. *See Bland*, 958 S.W.2d at 659. This Court has previously stated:

> Upon review, we note that the jury was instructed on voluntary manslaughter as a lesser-included offense of second degree murder. . . . Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. In finding the defendant guilty of second degree murder, the jury obviously rejected the theory that the Defendant was adequately provoked to act in an irrational manner by stabbing and killing the victim. As previously noted, the jury, as the trier of fact, determines the weight and value of the evidence and resolves all conflicts in the evidence. The jury, as was their prerogative, chose not to credit the Defendant's theory that he stabbed the victim while in a state of passion because he was adequately provoked, and we will not second-guess the factual determinations of the jury.

*State v. Anthony Whited*, No. M2010-00612-CCA-R3-CD, 2011 WL 6892352, at *6 (Tenn. Crim. App., at Nashville, Dec. 27, 2011) (internal citations omitted), *perm. app. denied* (Tenn. May 16, 2012).

In the case under submission, by finding the Defendant guilty of second degree murder, the jury, as was its prerogative, rejected the Defendant's claim that he killed the victim in a state of passion produced by adequate provocation. This Court will not second-guess the factual determinations of the jury. Accordingly, the Defendant is not entitled to relief on this issue.

### B. Prospective Juror

The Defendant argues that the trial court erred when it discharged a prospective juror for her inability to be impartial. Specifically, the Defendant contends that dismissing the prospective juror and proceeding with the remaining panel of thirteen jurors violated his right to a jury trial. Further, the Defendant argues that the trial court erred when it denied a defense motion to dismiss the entire panel and recommence voir dire with a new venire. The

15

State counters that, because the trial court did not abuse its discretion in selecting a jury, its decisions should not be disturbed. We agree with the State.

Amendment VI of the United States Constitution and Article I, section 9 of the Tennessee Constitution both guarantee a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Toombs v. State*, 270 S.W.2d 649, 650 (1954)). "To achieve this goal of fair and impartial juries, voir dire permits questioning by the court and counsel so that certain potential jurors can be properly challenged and stricken." *State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012) (citing *Akins*, 867 S.W.2d at 354). As a result, a trial court is vested with great discretion in conducting the selection of a fair and impartial jury. *State v. Schmeiderer*, 319 S.W.3d 607, 624 (Tenn. 2010) (appendix); State *v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992). Rule 24 of the Tennessee Rules of Criminal Procedure, which governs voir dire, provides, in pertinent part, as follows:

(b) Questioning Potential Jurors.

(1) Questioning Jurors by Court and Counsel. The court may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case. It shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges.

(2) Questioning Outside Presence of Other Jurors. On motion of a party or its own initiative, the court may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

(c) Challenges for Cause.

(1) Procedures. After examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause. After the court has tentatively determined that the jury meets the prescribed qualifications, counsel may conduct further examination and, alternately, may exercise challenges for cause.

Tenn. R. Crim. P. 24(b), (c). The Tennessee Supreme Court has interpreted that rule to give the "trial judge the right to excuse a juror for cause without examination of counsel." *State*

*v. Hutchison*, 898 S.W.2d 161, 167 (Tenn. 1994). Additionally, Tennessee Code Annotated provides the following:

> A court may discharge from service a grand or petit juror who does not possess the requisite qualifications, or who is disqualified from such service, or for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part that will prevent the juror from acting impartially shall constitute such cause.

T.C.A. § 22-1-105 (2009). Therefore, in reviewing the trial court's disqualification of a potential juror, the standard historically applied has been that the trial court's decision must be upheld on appeal absent a clear abuse of discretion. *Schmeiderer*, 319 S.W.3d at 625 (appendix); *State v. Raspberry*, 875 S.W.2d 678, 681 (Tenn. Crim. App. 1993). Lastly, irrespective of whether the trial court should have excluded a juror for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *State v. Howell*, 868 S.W.2d at 248; *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989).

In this case, we conclude that the trial court did not abuse its discretion in discharging the Juror in question. Immediately after the trial court dismissed the remaining jury pool, but before swearing in and empaneling the fourteen prospective jurors, the Juror informed a deputy that she needed to discuss a matter with the trial court. The Juror explained to the trial court that she and her husband had been involved in an incident with the Memphis Police Department that undermined her confidence in some of the police officers. She expressed her concern that this incident would affect her judgment as a juror in that she would not be able to accept a police officer's testimony and assess the officer's credibility in an impartial manner. The Juror said she did not know whether she could weigh the testimony of police officers the same as other witnesses because this incident had recently occurred. After listening to the Juror's statements, the trial court determined that the Juror could not "promise" that she would be able to be fair in this case. He, therefore, dismissed her. We conclude that the trial court did not abuse its discretion in discharging the Juror for cause. *See* T.C.A. § 22-1-105.

Further, the trial court did not err in denying a defense motion to dismiss the entire panel and recommence voir dire with a new venire. Although the Defendant claims that, had he known that the trial court would excuse the Juror for cause, he "could have presumably utilized available peremptory challenges on subsequent potential jurors," this claim is unfounded. At the time the trial court excused the Juror, the panel of fourteen potential jurors had already been selected and accepted, and the remaining venire had been discharged by the trial court. Therefore, at that point in the jury selection process, the Defendant could no longer exercise a peremptory challenge. Tenn. R. Crim. P. 24(d). The trial court,

however, could still dismiss a juror for cause at that time in the proceedings. T.C.A. § 22-1-105; Tenn. R. Crim. P. 24(c). The trial court did not replace the Juror with another prospective juror; rather, the trial court decided to proceed to trial with thirteen, instead of fourteen, jurors. *See State v. David Lee Richards*, No. 03C01-9207-CR-230, 1993 WL 80536, at *2 (Tenn. Crim. App., at Knoxville, Mar. 23, 1993) (holding that the trial court did not abuse its discretion in proceeding with thirteen, rather than fourteen, jurors), *perm. app. denied* (Tenn. July 6, 1993); *see also State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991) (holding that the decision to discharge a juror and to select an alternate juror is left to the discretion of the trial court). Therefore, an alternate juror was neither used nor needed, causing no prejudice in that respect. *See State v. Max*, 714 S.W.2d 289, 294 (Tenn. Crim. App. 1986) (holding that one challenging the trial court's decision to seat an alternate juror has the burden of demonstrating how he or she was prejudiced by that action). The Defendant, therefore, has failed to show how his inability to use his peremptory challenge caused prejudice to his case. Further, the Defendant has not shown that the jury that heard his case was not fair or impartial. *State v. Howell*, 868 S.W.2d at 248; *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). The jury deliberated for nearly six hours over two days, convicting him of second-degree murder, which was a lesser-included offense of the charged crime. We conclude that the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

18